**GREATER YELLOWSTONE COALITION; Jackson Hole Alliance for Responsible Planning; American Buffalo Foundation; Gallatin Wildlife Association; David A. Ritchey; Defenders of Wildlife, Plaintiffs,**

v.

**Bruce BABBITT, Secretary, U.S. Department of the Interior; Roger Kennedy, Director, National Park Service; Michael Finley, Superintendent, Yellowstone National Park; Daniel Glickman, Secretary, U.S. Department of Agriculture; Jack Ward Thomas, Chief, U.S. Forest Service; Terry Medley, Administrator, Animal and Plant Health Inspection Service, Defendants,**

and

**State of Montana and Marc Racicot, the Governor of the State of Montana, Defendant–Intervenors.**

**No. CV 96–82–H–CCL.**

United States District Court,
D. Montana,
Helena Division.

Dec. 19, 1996.

James S. Angell, Sierra Club Legal Defense Fund, Bozeman, MT, for Plaintiffs.

Martin J. LaLonde, Geoffrey Garver, U.S. Dept. of Justice, Environment and Natural Resources Division, Washington, DC, Sherry S. Matteucci, United States Attorney, Billings, MT, for Defendants.

W.D. Hutchison, Assistant Attorney General, Helena, MT, for Defendants–Intervenors.

## OPINION AND ORDER

LOVELL, District Judge.

In this case, several conservation groups and an individual challenge a federal action under the Administrative Procedure Act (the "APA") and the National Environmental Policy Act ("NEPA"). The Plaintiffs currently seek to enjoin implementation of the Interim Bison Management Plan (the "1996 Interim Plan"), which in 1995 was drafted jointly by the State of Montana ("Montana"), the National Park Service ("NPS"), and the Animal and Plant Inspection Service ("APHIS"), and has since been revised and finalized in 1996. This matter is before the court on Plaintiffs' motion for preliminary injunction. The court has jurisdiction over the matters raised pursuant to 28 U.S.C. § 1331 (federal question) and § 1346 (United States as defendant). Having reviewed the parties' briefs, having heard oral argument from the parties on November 26, 1996, and having reviewed the parties' post-hearing briefs, the court is prepared to rule as follows.

## I. BACKGROUND.

In 1995, Montana, NPS, and APHIS agreed upon a draft of the Interim Bison Management Operating Procedures (the "1996 Interim Plan") for managing Yellowstone bison that leave Yellowstone National Park (the "Park") and enter public and private lands in Montana. The NPS and Montana prepared a Draft Environmental Assessment ("EA") on the 1996 Interim Plan, and released it on December 20, 1995, for public comment. Over 260 comments on the EA were received from state and federal agencies, Native American tribes, various organizations, and individuals. The 1996 Interim Plan was corrected and revised based upon public comments. On August 5, 1996, a Finding of No Significant Impact ("FONSI") was issued by NPS which stated that pursuant to federal statutes and regulations no environmental impact statement need be prepared for the 1996 Interim Plan. On August 9, 1996, Montana issued a Decision Notice, which announced its intention to implement the 1996 Interim Plan. After the issuance of the NPS FONSI and Montana's Decision Notice, all parties to the 1996 Interim Plan approved the plan.

In 1902, there were approximately 23 bison ranging in Yellowstone National Park. See PI Mot., Ex. 13, "Draft Environmental Assessment," (hereinafter, "EA"), at 4. In order to increase the herd, domestic bison from Montana and Texas were brought to Yellowstone. Id. In order to further improve the herd, bison were herded by cowboys and managed as livestock, and a ranch was established in the Lamar Valley of the Park, with corrals and barns. Id. In 1954, there were approximately 1,477 bison in the park. EA at 15. NPS decided to reduce the herd, however, and by 1967 the number of bison had dropped to 397. Id.

In 1967, NPS changed its policy regarding the Yellowstone bison by deciding to discontinue its overt management of the bison. By 1988 there were 2,800 bison in the Park. Id. In 1992 there were 3,400 bison in the Park. EA at 1. In 1995 there were approximately 3,900 bison in the Park. EA at 21.

Thus, the Yellowstone bison herd has steadily increased over the years, and with these increases the herd has required more and more land for forage, causing the northern herd to wander out of the Park in winter months to seek additional forage in Montana. In 1968, the NPS began a program of boundary protection involving park personnel shooting bison approaching boundary areas. EA at 4. NPS subsequently discontinued its boundary protection program.

However, because the Yellowstone herd is infected with brucellosis,[1] and because bison

---

1. *Fund for Animals v. Lujan*, 794 F.Supp. 1015, 1019 (D.Mont.1991) (Finding of Fact No. 20).

have damaged private property and carry a health risk to humans, the State of Montana has had little choice but to destroy Yellowstone bison entering the state. Neither Montana nor the NPS has been satisfied with this state of affairs, which under the 1992 Interim Plan essentially required Montana to manage the Yellowstone herd for NPS by culling some 450 bison from the herd each winter, as these bison enter the State of Montana. It is important to note, however, that this annual culling of the herd by the State of Montana has had no impact upon the integrity of the herd, and in fact the herd has rebounded to even higher numbers despite Montana's removal[2] of bison each winter.

Recognizing that the Yellowstone bison, if they are to remain free-ranging,[3] must be jointly managed by state and federal governments, the NPS and the State of Montana entered into a Settlement Agreement in *State of Montana v. United States,* Cause No. CV 95-6 (D.Mont., Nov. 20, 1995), whereby NPS and Montana agreed to prepare an interim joint operations plan (the 1996 Interim Plan), to prepare an Environmental Assessment of the 1996 Interim Plan (the "EA") to determine whether an environmental impact statement ("EIS") need also be prepared, and to take public comments on the 1996 Interim Plan and the EA. All of these steps have been accomplished, and the Environmental Assessment and Response to Public Comments formed the basis of a Finding of No Significant Impact ("FONSI") by the Superintendent of the Park and the NPS

Director of the Intermountain Field Area. *See* PI Mot., Ex. 3. Accordingly, NPS and Montana have jointly determined that an EIS need not be prepared.[4] The 1996 Interim Plan is now being implemented within and without the Park, and Plaintiffs seek to enjoin certain parts of this plan.

## 1996 Interim Plan

The 1996 Interim Plan deals with an area north and west of Yellowstone National Park, in Park and Gallatin counties of the State of Montana, wherein 87% of the land is federally owned, 1% of the land is state owned, and 12% of the land is privately owned. During certain times of the year, cattle graze on private and public lands north and west of the Park. EA at 16.

### Eagle Creek/Bear Creek

The Montana Department of Livestock ("DOL") has the responsibility to remove bison that leave the Eagle Creek/Bear Creek area. DOL may request that NPS personnel assist in shooting operations outside of the Park. This procedure is intended to prevent bison moving onto private lands. No capture facilities are contemplated in the Eagle Creek/Bear Creek area.

### Reese Creek Area

Capture operations in the Stephens Creek[5] area of the Park are intended to prevent bison from leaving the Park in the Reese Creek boundary area and entering private lands. Bison that enter private lands

Brucellosis is a bacterial organism (*brucella abortus*) that causes female bison to abort fetuses. It causes sterility and fetal abortions in livestock and undulant fever, which can be a fatal illness, in humans. *Id.* Approximately fifty percent of the Yellowstone bison have been exposed (are seropositive) to brucellosis. Nationwide, over one billion dollars has been spent in the attempt to eradicate brucellosis from livestock. Montana was certified as brucellosis-free in 1985. *Id.*

2. Throughout the scientific documentation relating to the Yellowstone bison, "remove" is used to refer to an action resulting in the destruction or killing of a bison.

3. *Fund for Animals v. Lujan,* 794 F.Supp. at 1020 (Finding of Fact No. 31).

4. However, an EIS is currently being prepared to evaluate alternative long-term solutions to the

Yellowstone bison problems. The completion date for that EIS is July 31, 1997. It is being prepared by NPS, Montana Fish, Wildlife & Parks, Montana Department of Livestock, APHIS, and the United States Forest Service, and it specifically addresses the planning and environmental issues involved with the Long Term Bison Management Plan.

5. According to the Environmental Assessment, this area was held in private ownership until 1925, when it was purchased for the NPS, and is the current site of an "NPS corral operation, employee residence, plant nursery, and equipment storage area." EA at 19. Prior to acquisition for NPS, Stephens Creek was privately owned and used for hay and livestock cultivation. Stephens Creek is considered to be a part of the larger Reese Creek area.

are to be shot, with the permission of the private landowner. DOL is to conduct these removals, but NPS personnel are to assist in shooting these bison. The capture operations will be conducted within the Park in the Reese Creek area (the sole siting of a capture operation in the Park), and the captured animals will be shipped to slaughter. The Reese Creek area is not considered to be critical winter range for bison. EA at 21. Bison are not known to be a springtime food source for grizzly bears hibernating in the Reese Creek area. EA at 22. Gray wolves do not use the habitat in Reese Creek. *Id.*

*West Boundary Area*

In this area there will be portable capture facilities outside of the Park, and bison moving onto private lands will be shot with the permission of the private landowner. All captured bison will be field tested for brucella antibodies, and all bison testing positive will be shipped to a slaughter facility. Male and non-pregnant[6] female bison that test negative for brucella antibodies will be permitted to move onto public lands adjacent to the Park. It is estimated that about 40% of the migrating bison in the West Yellowstone area will be saved under the 1996 Interim Plan, as opposed to having potentially all of the Yellowstone bison in this area being shot under the previous interim plan. EA at 28. The West Yellowstone area only provides marginal winter habitat, and was not used by bison prior to the 1980s. EA at 21. Bison are not known to be a significant springtime food source for grizzly bears hibernating in the West Yellowstone area, but it is expected that bison winterkill will continue unaffected by the 1996 Interim Plan and such carrion will continue to be available for grizzly bear consumption. EA at 22. Gray wolves do not use the habitat at West Yellowstone. *Id.*

*Other Areas*

Bison sometimes move into remote public lands adjacent to the Park, such as Hellroaring Creek, Slough Creek, and portions of the Lee Metcalf/Cabin Creek area. These bison will be monitored and allowed to remain on these outlying public lands.

**1992 Interim Plan**

Under the 1992 Interim Plan, which was also analyzed by an Environmental Assessment,[7] NPS personnel assisted State of Montana personnel in shooting bison in Montana that posed a threat to private property or human safety. However, the DOL was primarily responsible for shooting bison migrating into Montana on private lands (including the Reese Creek area), with the permission of the private landowner. The DOL also removed bison found on Gallatin National Forest lands (West Yellowstone area) from May 1 through October 31. From November 1 through April 30, the Montana State Veterinarian selectively decided which bison in the West Yellowstone area (outside of the Park) were to be shot. There was monitoring of bison in the Eagle Creek/Bear Creek area, Hellroaring Creek, and Slough Creek, and Lee Metcalf/Cabin Creek areas, and the DOL removed animals moving out of these areas into Montana.

## II. PRELIMINARY INJUNCTION STANDARD.

To prevail on their motion for preliminary injunction, Plaintiffs must show (1) probable success on the merits, (2) possible irreparable injury, and (3) a public interest favoring plaintiff. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668 (9th Cir. 1988). In the alternative, where the balance of hardships tips decidedly toward the plain-

---

**6.** Pregnant female bison carry the *brucella abortus* microorganism. Transmission to other bison does not occur until the female bison aborts a fetus. The incubation period can be as long as one year, and during that year, an exposed animal will not test positive for brucella antibodies. *See* EA at 17. Because of the difficulty of detecting the brucella organism and the ease with which a non-infected herd can be exposed, a National Brucellosis Program was begun in 1934, and in 1947 Uniform Methods and Rules for brucellosis eradication were adopted. *Id.*

Not only has the number of infected herds been markedly reduced by this program, but also the number of cases of undulant fever in humans has dropped sharply (6,300 in 1947 to 119 in 1994). *Id.*

**7.** *See Fund for Animals v. Lujan,* 962 F.2d 1391 (9th Cir.1992) (affirming district court decision that state and federal agencies need not prepare EIS before adopting plan to kill bison that leave Yellowstone National Park).

tiff, the court need not require a robust showing of likelihood of success on the merits and may grant relief if the plaintiff's moving papers raise "serious questions" on the merits. *Id.* at 674.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS.

According to the Environmental Assessment, the 1996 Interim Plan is designed "to maintain a wild, free-ranging, self-sustaining bison population in Yellowstone National Park." EA at 3. Besides reducing the threat of the transmission of brucellosis from bison to cattle in areas of Montana adjacent to the Park, the 1996 Interim Plan also seeks to "reduce the indiscriminate killing of those bison posing no disease threat to domestic cattle." *Id.* However, Plaintiffs argue that key pieces of the 1996 Interim Plan should be enjoined as violative of the APA and NEPA.

*APA VIOLATIONS*

Plaintiffs assert three APA violations. The first two violations both claim that the 1996 Interim Plan is arbitrary and capricious in that it violates the National Park Service Organic Act (the "Organic Act"), 16 U.S.C. §§ 1 and 3. In their third claim, Plaintiffs argue that the 1996 Interim Plan is "otherwise in violation of the law" by violating the Yellowstone Organic Act (the "Yellowstone Act"), 16 U.S.C. § 26.

■ *Organic Act Claims.* Title 16 of the United States Code, section one, requires NPS to conform its actions to its purpose, which "purpose is to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for their enjoyment and leave them unimpaired for future generations." 16 U.S.C. § 1. Plaintiffs argue that by this statutory language Congress has clearly required NPS to leave the Yellowstone bison absolutely untouched. But the statutory purpose language obviously gives park managers broad discretion in determining how best to conserve wildlife and to leave them unimpaired for future generations. *See e.g., Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1454 (9th Cir.1996).

In the case at hand, for example, how best to conserve a bison herd infected with a serious disease, which disease has been the subject of a nation-wide eradication program for some fifty years? How best to leave the herd unimpaired for future generations when the neighboring governmental entity can legally, and will in fact, shoot members of the herd stepping over the political boundary line? How best to conserve and protect this particular herd under these particular circumstances?

■ This is just the type of question that the APA contemplates when it permits an agency to make a well-reasoned discretionary decision based upon its expertise. In this case, federal regulation mandates that the NPS administer the park in accordance with approved general management and resource management plans, or in emergency operations involving threats to life, property, or park resources. *See* 36 C.F.R. 1.2(d). The 1996 Interim Plan is an approved resource management plan that was created within the discretionary powers of the NPS.

■ In their next argument, Plaintiffs assert that the Organic Act requires a finding of "detriment" before NPS may destroy park resources. The statute cited by Plaintiffs provides that

[t]he Secretary of the Interior ... may also provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks, monuments, or reservations.

16 U.S.C. § 3. Plaintiffs couple this statute with an NPS policy requiring an explicit finding of detriment by a park superintendent when a controlled harvest program is contemplated, i.e., a program designed to kill a percentage of a herd for no other reason than the desire to reduce the size of the herd. *See* 48 Fed.Reg. 30,264 (June 30, 1983). However, the very language of this policy limits it to situations involving a controlled harvest. *Id.* This "explicit finding" policy is inapplicable on these facts, therefore, because the 1996 Interim Bison Plan does not authorize a controlled harvest program but a boundary protection program.

In any event, the obvious purpose of the policy is to require a park superintendent to make the decision to reduce the size of a wildlife population in writing and to make that decision based upon scientific documentation. Although in this case the Yellowstone Superintendent's decision is not a decision to reduce the size of a wildlife population, it is a written program decision based on scientific documentation. Accordingly, Plaintiffs' "explicit finding of detriment" argument under 16 U.S.C. § 3 is not likely to succeed on the merits.

As Defendant–Intervenors point out, Montana has been forced periodically to thin and cull the Park's bison herd, with the result that the herd has produced maximum numbers of bison for public enjoyment. *Fund for Animals v. Lujan,* 794 F.Supp. at 1021. Had Montana not performed this function for the NPS but instead fenced certain Park boundaries, hundreds of bison might starve within the Park each winter. *Id.* at 1018. Additionally, given the infectious disease within the herd and Montana's stringent removal program, NPS might reasonably consider that its failure to cooperate with Montana would be detrimental to the use of the Park.

■ Defendants also point out that they have statutory authorization to cooperate with states in the enforcement of state laws. 16 U.S.C. § 1a–6 provides that "[t]he Secretary of the Interior is authorized to— ... (2) cooperate, within the National Park System, with any State or political subdivision thereof in the enforcement of supervision of the laws or ordinances of that State or subdivision...." In this case, Montana law requires that wild bison exposed to brucella be hazed out of the state or captured and destroyed. Mont.Code Ann. § 81–2–201(1). Clearly, the NPS has a rational interest in cooperating with Montana both to reduce the total annual number of Yellowstone bison destroyed and also to reduce the herd's population of brucella-exposed bison. NPS policies clearly authorize NPS cooperation with Montana to control brucellosis in the Yellowstone herd and migration of the herd out of the Park. *See* Def.Brief in Opp. to PI Mot., Ex. A, "Natural Resource Management

Guidelines, NPS–77 (1991)", and Ex. B, "Resource Management Plan for Yellowstone".

Generally, Plaintiffs' arguments call for the NPS to take an extremely myopic view of the Yellowstone bison herd, such that when members of the herd step over the (invisible) political boundary line, Plaintiffs would have the NPS pretend that these Yellowstone bison have simply disappeared. Such a myopic view does not square with an ecosystems approach to the Yellowstone bison herd. In responding to public comments on the Draft Environmental Assessment, the NPS states that its policy is to manage park resources and activities within a regional and ecosystems context:

> Park activities also may have effects outside the boundaries of the parks. Pertinent policies guide park involvement in planning in a regional context and working cooperatively to address mutual problems or issues that cross boundaries. NPS units strive to work with adjacent federal, state, local agencies, and adjacent landowners in cooperative planning and management. Because parks are integral parts of larger regional environments (ecosystems), the NPS works cooperatively with others to anticipate, avoid, and resolve potential conflicts, and to protect park resources.

PI Mot., Ex. 5, "Summary of Substantive Public Comments and Responses to the Interim Bison Management Plan Draft Environmental Assessment," at 44.

■ Because the NPS has statutory authorization to cooperate with Montana in prohibiting the entrance of brucellosis-infected bison to the state and because NPS policy calls for an ecosystems approach to managing park resources, it appears that Plaintiffs' are not likely to succeed on the merits of their Organic Act claims.

■ *Yellowstone Act Claim.* Next, Plaintiffs assert pursuant to the Yellowstone Act, 16 U.S.C. § 21 *et seq.,* that the Yellowstone anti-poaching statute applies to the NPS. This criminal statute provides that

> [a]ll hunting, or the killing, wounding, or capturing at any time of any bird or wild animal, except dangerous animals, when it

is necessary to prevent them from destroying human life or inflicting an injury, is prohibited within the limits of said park. . . . The Secretary of the Interior shall make and publish such rule and regulations as he may deem necessary and proper for the management and care of the Park and for the protection of the property therein and for the protection of the animals and birds in the Park, from capture or destruction, or to prevent their being frightened or driven from the Park.

16 U.S.C. § 26.[8] However, Defendants have countered Plaintiffs' argument by citing *Frost v. Garrison*, 201 F.Supp. 389, 390 (D.Wyo.1962), which states that section 26 "cannot be construed to constitute a prohibition against the Secretary of Interior from destroying such animals as may be detrimental to the National Park." Indeed, the legislative history of the statute and the history of the NPS activities in Yellowstone indicates that this criminal statute was intended to apply to members of the public, not the NPS. *See* Def.Brief in Opp. to PI Mot. at 25–26.

■ Defendant–Intervenors analogize this statute to Montana's state law prohibiting the illegal distribution of controlled substances. Defendant–Intervenors point out that this law does not prevent Montana law enforcement officers from distributing controlled substances within approved undercover law enforcement operations. Similarly, despite the fact that it is generally illegal for the public to poach wild game within the park, it is still permissible for park personnel to capture or kill wild game under approved wildlife management plans.

■ Finally, Plaintiffs' interpretation of 16 U.S.C. § 26 would bring that statute into conflict with another Yellowstone Act statute giving direct authority to the Secretary of the Interior to sell or dispose of surplus bison. *See* 16 U.S.C. § 36. A plain reading of the two statutes compels the court to construe section 26 as a criminal anti-poaching statute which regulates the conduct of the visiting public and section 36 as a statute giving broad discretion to the NPS to dispose of surplus bison. This being the case, Plaintiffs are not likely to succeed on their Yellowstone Act claim.

## NEPA VIOLATION

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to consider all environmental impacts of a proposed federal action and to inform the public of the environmental issues considered during the decision-making process. *See Baltimore Gas v. NRDC*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). The role of the courts "is to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that the decision is not arbitrary or capricious." *Id.* at 97–98, 103 S.Ct. at 2252–53. However, a court may not require agencies "to elevate environmental concerns over other appropriate considerations." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980). Neither should a court substitute its own judgment for that of the agency. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). If a federal agency has taken the requisite "hard look," the agency's decision should be affirmed. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The standard of review to be applied by the court to an agency's decision is to determine whether the

---

**8.** The court notes here that Plaintiffs' reading of this statute narrows unnecessarily the language of exception ("when it is necessary to prevent them from destroying human life or inflicting an injury"). Plaintiffs interpret the exception to apply only in instances involving destruction of human life or infliction of human injury. Had Congress meant to say 'to prevent them from destroying or injuring human life' it could have so stated. Instead, this exception applies in situations involving destruction of human life or infliction of an injury, and therefore could rea-

sonably encompass both personal and property injuries. Even though Defendants do not care to rely on this exception, the court's interpretation of this statute would allow them to do so. The court recalls that Defendants, when asked whether the bison are dangerous, responded in the negative. That may have been an appropriate answer considering the NPS's overall liability for public safety, but there can be no real question that the bison is a dangerous animal for purposes of this anti-poaching statute.

decision was arbitrary and capricious. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989). The court must limit its review to the administrative record [9] supporting the decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 1607–07, 84 L.Ed.2d 643 (1985). A presumption of validity attaches to agency decisions made on the record. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.) (*en banc*), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

Plaintiffs assert that Defendants violated NEPA by failing to prepare an EIS and by failing to consider the requirements of 40 C.F.R. § 1506.1(c). At the heart of both violations is the allegation that the 1996 Interim Plan is a major federal action significantly affecting the environment.

On August 5, 1996, the NPS issued a written finding, pursuant to 40 C.F.R. § 1508.13, that the proposed 1996 Interim Plan would not have a significant impact on the human environment and would not constitute an action requiring preparation of an EIS (the "Finding of No Significant Impact" or "FONSI"). *See* PI Mot., Ex. 3. The NPS based its FONSI on its scientific findings stated in the Environmental Assessment, ultimately finding that

> [n]egative environmental impacts that could occur are minor and temporary in effect. There are no unmitigated adverse impacts on public health, public safety, threatened or endangered species, sites or districts listed on or eligible for listing in the National Register of Historic Places, or other unique characteristics of the region. No highly uncertain or controversial impacts, unique or unknown risks, cumulative effects, or elements of precedence were identified. Implementation of the action will not violate any federal, state, or local law.

PI Mot., Ex. 3 at 2. Under NEPA regulations, an environmental impact statement need not be prepared when a federal agency determines that an action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13. The court reviews the agency decision not to prepare an EIS under the arbitrary and capricious standard. *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir.1996).

Plaintiffs object that the NPS did not properly consider the criteria provided by 40 C.F.R. § 1508.27 in preparing the FONSI. Plaintiffs assert that the following factors counsel preparation of an EIS (and by implication a finding of significant impact on the human environment):

> (1) the uniqueness of the affected area or resource, including the proximity to park lands; (2) the likelihood that the proposed action will be highly controversial; (3) the degree to which the proposed action may set a precedent for future actions with significant impacts; and (4) whether the action threatens a violation of federal, state, or local environmental laws.

Pl.s' Reply Brief at 10. However, all of these factors were extensively discussed and considered in the EA (Appendix A, FONSI) and the Summary of Substantive Public Comments and Responses to the Interim Bison Management Plan Draft Environmental Assessment (Appendix B, FONSI). Although it is clear that Plaintiffs differ from the NPS in their conclusions as to each of the above-stated criteria, it is also clear that the NPS gave each criteria the requisite "hard look." The court cannot conclude that the agency was arbitrary or capricious in evaluating these criteria.

■ Plaintiffs also object that Defendants intend to spend $200,000 for the 1996 Interim Plan, a portion of which will be devoted to the construction of temporary improvements to the Park such as corrals. However, this is not a large sum considering the overall sums expended by Defendants on bison management and the fact that the temporary improvements can be taken down and used elsewhere. *See, State of North Car-*

---

**9.** The Defendants filed the administrative record in this case on December 13, 1996. Having conducted a preliminary review of the administrative record, the court agrees with the parties that all documents pertinent to the preliminary injunction motion were attached as exhibits to the parties' briefs.

*olina v. City of Virginia Beach,* 951 F.2d 596 (4th Cir.1991).

Plaintiffs next assert that the NPS cannot implement the 1996 Interim Plan because, under 40 C.F.R. § 1506.1(c), no "major Federal action covered by the program which may significantly affect the quality of the human environment" should be taken "[w]hile work on a required program environmental impact statement is in progress. . . ." This argument would probably have some validity if the NPS had failed to prepare the FONSI. Having determined that the 1996 Interim Plan does not significantly affect the human environment, however, the NPS is not bound by the requirements of 40 C.F.R. § 1506.1(c). It is therefore not likely that Plaintiffs' NEPA claims will succeed on the merits.

## IV. IRREPARABLE INJURY.

█ The court is not convinced that Plaintiffs have shown the likelihood of irreparable injury or that a balancing of harms tips sharply in their favor. It is unlikely that any more Yellowstone bison will be removed from the herd under the 1996 Interim Plan than would be removed under the current plan. In fact, Defendants hope that fewer bison will be removed under the proposed plan. Although clearly some captures and removals will take place within the park rather than without the park, the court is not convinced that action taken on one or the other side of an invisible line *per se* leads to any injury, much less irreparable injury. It certainly makes no difference to the bison that are removed. In addition, Plaintiffs' assertion that under the previous plan the bison in Reese Creek would have been hazed back into the Park is contradicted by evidence that bison in Reese Creek typically cross into the State of Montana, where they are eventually shot and killed. *See* PI Mot., Ex. 5 at 48.

Plaintiffs assert that their "environmental, emotional, and aesthetic interests" in experiencing Yellowstone as a wildlife sanctuary will be irreparably injured by the proposed actions in the Park. However, Plaintiffs have not shown that they are legally entitled to demand "unmanaged wildlife" (as Plain-

tiffs characterize it); the NPS is the federal agency responsible for determining how best to conserve Park resources and to manage Yellowstone bison. Even if the NPS were to determine, after thoughtful consideration and study, that the best means of conserving and managing the Yellowstone bison would be to return to Yellowstone's bygone days of corrals, cowsheds, and cowboys (however unlikely the prospect), Plaintiffs might still have great difficulty showing that such an intensive management program was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

█ Plaintiffs also assert that part of the irreparable injury is the loss of the free-ranging nature of the Yellowstone bison by means of NPS removals of bison within the Park. While it is true that a very small portion of the Park (the Stephens Creek area of Reese Creek) will contain a capture operation, the Yellowstone herd will remain otherwise free-ranging in the Park. Given that there is statutory authority for the NPS to sell or dispose of surplus Yellowstone bison, *see* 16 U.S.C. § 36, it seems to the court that the NPS is well within its discretion to remove surplus bison (in the sense that they are not required for the future integrity of the herd) from the Park when they threaten neighboring landowners. This is so particularly when the NPS is attempting to act according to its written policy, which calls for joint management of Yellowstone bison with the State of Montana, including giving assistance to Montana in enforcing its laws pertaining to brucellosis-infected wildlife.

The Plaintiffs' claim regarding failure to prepare an EIS for the 1996 Interim Plan, which is the third source of Plaintiffs' irreparable injury, is without merit, as explained in Section III above.

## V. PUBLIC INTEREST.

█ Plaintiffs assert that Defendants have broken the law and that the public interest lies in having this court compel Defendants to comply with the law. *See Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1089 (W.D.Wash.1991) (enforcing govern-

ment lawfulness invokes a public interest of the highest order). I agree that there is a strong public interest in governmental compliance with environmental laws. In this case, however, the obvious counter-argument is that no law has been broken. But there is more than this one facet to the public interest in this case.

There is also an important public interest in the eradication of brucellosis from the nation's livestock (which ultimately safeguards public health), as evidenced by decades of state and federal programming and hundreds of millions of dollars devoted to that goal. There is also a public interest in joint management of the Yellowstone bison herd by the two governments that share authority over the herd. Such a joint program acknowledges that this free-ranging bison herd does not recognize political jurisdictions or boundaries and frequently crosses into Montana and other states. There is a public interest in minimizing bison removals (whether from within or without the Park) whenever possible. There is also a public interest in protecting adjacent landowners from property damage by wandering bison. On balance, the court finds that the 1996 Interim Plan reasonably furthers the many aspects of the public interest in this case.

## VI. CONCLUSION.

The court has concluded that all the competing public interests are best served by allowing the 1996 Interim Plan to go forward. Plaintiffs have failed to show (1) that Plaintiffs are likely to succeed on the merits of their claims, (2) that there is any threat of irreparable injury or a balancing of harms tipping sharply in Plaintiffs' favor, or (3) that the public interest is harmed by the 1996 Interim Plan.

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motion for preliminary injunction is DENIED.