**GREATER YELLOWSTONE COALITION, et al., Plaintiffs,**

v.

**Dale BOSWORTH, et al., Defendants.**

**Civil Action No. 01–1516 (RMU/JMF).**

United States District Court, District of Columbia.

May 30, 2002.

Timothy Joseph Preso, Bozeman, MO, for Plaintiffs.

John P. Almeida, U.S. Department of Justice, Environment & Natural Resources Division, Martin Lalonde, Washington, DC, for Defendants.

## ORDER

ADOPTING REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE FACCIOLA; ISSUING
THE INJUNCTION AND FINAL JUDGMENT

URBINA, District Judge.

It is this 30th day of May 2002,

**ORDERED** that the defendants' objection to the Report and Recommendation is **OVERRULED**; and it is

**FURTHER ORDERED** that the report and recommendation submitted to this court on May 13, 2002 by Magistrate Judge Facciola is **HEREBY ADOPTED** in total as the opinion of this court; and it is

**ORDERED** that the grazing permit for the Horse Butte allotment, issued by the Forest Service in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, is **VACATED**; and it is

**FURTHER ORDERED** that any further livestock grazing on the Horse Butte allotment is **ENJOINED** until the Forest Service complies with NEPA.

This is a **FINAL JUDGMENT**.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

FACCIOLA, United States Magistrate Judge.

Currently pending and ready for resolution are *Plaintiffs Greater Yellowstone Coalition, Et Al.'s Motion for Summary Judgment* and *Defendants' Motion for Summary Judgment.* Plaintiffs, Greater Yellowstone Coalition, Intertribal Bison Cooperative, Defenders of Wildlife, National Wildlife Federation, Wyoming Wildlife Federation, and Gallatin Wildlife Association (collectively "GYC"). claim that defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. § 4321 *et seq.* (1996), by failing to conduct an environmental assessment before reissuing a livestock grazing permit on federal public lands.

## BACKGROUND

The wild American buffalo (*Bison bison*) herd of Yellowstone National Park ("Park") is the last remnant of the vast herds that once roamed the American West. Having dwindled to approximately 20 bison by the turn of the century, the Yellowstone herd has rebounded to roughly 2,500 today, and the bison are a showcase species of the Park's unparalleled fauna.[1] Being bison, they have no concept of Park boundaries and frequently roam outside of the Park in search of food and more hospitable weather conditions. In winter months especially, bison will descend from the Park to lower elevations, including public National Forest lands. As much as bison may be beloved by the Park's visitors, they are not so highly regarded by Montana and Idaho ranchers who hold permits to graze cattle and horses on National Forest lands.[2] The natural migration of the bison to public livestock grazing lands is a source of major controversy because bison are said to transmit brucellosis to cattle.[3] Brucellosis is a bac-

---

1. Bison are ranked as one of the top ten animals that visitors to the Park hope to see. II. Administrative Record "A.R." 1060A XXX.

2. Under a practice dating back to the 19th century, millions of acres of lands owned by the federal government and managed by the National Forest Service ("Service") are leased to private ranchers for seasonal livestock grazing. Grazing permits are generally issued by the Service for a 10 year duration and set forth the terms of the grazing. 36 C.F.R. § 222.3.

3. Although there is no doubt that bison have transmitted brucellosis to cattle under controlled conditions, GYC notes that there have been no documented cases of transmission in the wild. Pls. Mot. at 7. Ironically, it appears that the bison herd originally contracted the disease from cattle. II A.R. 1060A, I *Bison Management Plans for the State of Montana*

terial agent that causes reproductive failure in cattle and is therefore considered a major threat to livestock interests.

In order to protect livestock from brucellosis, National Park Service and Montana state officials have conducted various spatial and temporal separation efforts since the 1980's.[4] The bison control efforts have included hazing (buzzing the animals with helicopters and off-road vehicles so as to drive them back towards the Park), capturing, and killing bison on lands outside the Park. The number of slaughtered bison varies from year to year, but the totals have been substantial. In the unusually harsh winter of 1996–97, for example, over 1,084 bison (almost one third of the entire Yellowstone herd) were killed, much to the dismay of wildlife supporters and conservationists. Numerous lawsuits challenging the bison control programs have been litigated over the last 17 years, but, plaintiffs claim, largely to no avail.[5] Plaintiffs' supplemental filing indicates that the capturing and slaughtering efforts have continued throughout this winter and spring. *Plaintiffs Greater Yellowstone Coalition, Et Al.'s Motion for Leave to Submit Supplemental Evidence in Support of Request for Injunctive Relief,* Exh. 1.

After years of discussion and the implementation of interim measures, the Forest Service, Park Service, and the State of Montana, among others, issued a comprehensive Joint Bison Management Plan ("Bison Plan") on December 20, 2000. II A.R. 1060A. The Bison Plan attempts to reduce the occurrence of hazing, capturing, and killing of bison that leave the Park's boundaries, but does not specifically eliminate these practices. II A.R. 1087, 1090. In addition, the Bison Plan provides that the impact of livestock grazing on bison will be addressed separately upon issuance of each grazing permit. II A.R. 1060A.

In November 1994, in response to various court decisions, the Forest Service implemented a policy to conduct NEPA analyses for the reissuance of grazing permits. I A.R. at 209.[6] Given the vast number of grazing permits reissued every year,[7] it is not surprising that the Forest Service was unprepared to handle this new slate of NEPA reviews. It quickly became apparent that the Service would not be able to complete all NEPA analyses in time to reissue expiring permits. In response to the looming threat that many permits would not be reissued for failure to complete the NEPA review, Congress enacted the Rescissions Act, Pub.L. No. 104–19, 109 Stat. 194.[8] (1995). The Rescissions Act

---

and *Yellowstone National Park: Final Environmental Impact Statement* 10 (2000).

4. In fact, as early as 1968, NPS officials had begun shooting bison leaving the Park. *Intertribal Bison Co-op. v. Babbitt,* 25 F.Supp.2d 1135, 1137 (D.Mont.1998), *aff'd,* 175 F.3d 1149 (9th Cir.1999).

5. *See Fund for Animals v. Hodel,* Civ. No. 85–250–BU (D.Mont.1985)(no published opinion); *Fund for Animals v. Lujan,* 794 F.Supp. 1015 (D.Mont.1991), *aff'd,* 962 F.2d 1391 (9th Cir.1992); *State of Montana v. United States,* Civ. No. 95–6 (D.Mont.1995)(no published opinion); *Greater Yellowstone Coalition v. Babbitt,* 952 F.Supp. 1435 (D.Mont.1996), *aff'd,* 108 F.3d 1385 (9th Cir.1997); *Intertri-*

*bal Bison Cooperative v. Babbitt,* 25 F.Supp.2d 1135 (D.Mont.1998).

6. NEPA is a comprehensive statute that establishes a process by which federal agencies must consider the effects of their actions on the environment. 42 U.S.C.A. § 4321 *et seq.*

7. Roughly 2,660 permits requiring NEPA analysis were scheduled to expire by December 31, 1995 alone. Answer ¶ 18.

8. The full title of the statute is "1995 Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti–Terrorism Initiatives, for Assistance in the Recovery from the Tragedy That Occurred at Oklahoma City, and Rescissions Act."

established a temporary exemption from NEPA review for those permits that were up for reissuance before the NEPA review for that allotment had been completed. The Act directed each National Forest to establish and adhere to a schedule for conducting NEPA reviews on all of the grazing allotments in that Forest. Rescissions Act § 504(a), 109 Stat. 194. It also provided that if a grazing permit came up for reissuance before the time stated in the § 504(a) schedule for NEPA review, the Service must automatically reissue the permit. § 504(b), 109 Stat. 194. Thus, no rancher would be left with an expired permit solely because the Service had not completed NEPA analysis in accordance with the schedule the Service had adopted.

One of the National Forests that was affected by the Rescissions Act was the Gallatin National Forest in Montana. This Forest covers portions of the Horse Butte peninsula, which juts into Hebgen Lake, a few miles west of Yellowstone National Park. The Horse Butte peninsula also includes private land owned by the Munns Brothers, a family-owned ranching partnership. The National Forest land has been used for livestock grazing since 1932, and the Munns Brothers have held a permit on the allotment from 1961 to the present. Because the Horse Butte peninsula is so close to the Park, it is a favorite seasonal grazing area for the bison. As already stated, the bison's presence on the same lands used by cattle creates the potential for the transmission of brucellosis from the bison to the cattle. Thus, the various separation measures carried out by state and federal agencies are designed to prevent the bison from roaming onto the Horse Butte allotment in particular. The effects of this separation program would be one of the most prominent topics of a NEPA review of the Horse Butte allotment grazing permit reissuance.

Pursuant to the Rescissions Act, in November 1995, the Gallatin National Forest established a NEPA compliance schedule that set a 1998 environmental analysis and decision date for the Horse Butte allotment. I A.R. 198. This compliance date was later included in a national list compiled by the Forest Service's national headquarters. I A.R. 263.

By the summer of 1997, officials at the Gallatin National Forest anticipated that the 1998 deadline would not be met. There is conflicting evidence as to whether the Service was intentionally delaying the NEPA analysis so as to tier it to the Bison Plan that was in the works, or whether it had simply fallen behind in its work. On July 24, 1997, Claude Coffin, an Assistant District Ranger, wrote in an internal memorandum that "our plans for completing NEPA on [the Horse Butte] allotment depended on completion of the EIS for bison management." I A.R. at 630. In August 1997, Gary L. Benes ("Benes"), the District Ranger with jurisdiction over the Horse Butte allotment, wrote to the Munns Brothers that the NEPA analysis would not be complete in fiscal year 1998 because four other "higher priority" allotments were ahead in line. I A.R. at 106. On May 24, 1999, Benes wrote to David P. Garber, the Gallatin National Forest Supervisor, "Because of the inter-agency effort to complete the EIS for the Bison Management Plan, we decided not to complete the Horse Butte analysis. We felt the Horse Butte analysis should be tiered to the Record of Decision for the Interagency Management Plan." I A.R. at 638.

In any event, fiscal year 1998 came and went and the Forest Service failed to initiate, let alone complete, the NEPA analysis for Horse Butte. At some point, the original schedule issued in 1995 was amended to postpone the Horse Butte date, but is not quite clear under what circumstances

this amendment was made. There is some indication that in 1996 the Horse Butte allotment was moved from 1998 to 2001, but no later records reflect this amendment as ever having been carried out. I A.R. 203. Then, at some point in late 1999 or early 2000, the Horse Butte date was moved from 1998 to 2004. A December 1999 schedule still included Horse Butte in a list of allotments to be completed by 1998, but a handwritten note indicates that the date had been changed to 2004. I A.R. at 610. A revised schedule dated approximately one month later shows a decision date of 2004 for the Horse Butte allotment. I A.R. at 618.

Meanwhile, the Munns Brothers' permit was due to expire on December 31, 2000. The permit was reissued on December 19, 2000. The District Ranger, invoking § 504(b) of the Rescissions Act, 109 Stat. 194, reissued the permit for another 10 years on the same terms, subject to modification upon completion of the NEPA analysis. I A.R. at 169. The reissuance allowed the Munns Brothers to continue to graze 147 head of cattle and 30 horses on the allotment. I A.R. at 171.

## DISCUSSION

Plaintiffs contend that the Service's reissuance of the Horse Butte permit violated NEPA and thereby constituted an unlawful agency action under the Administrative Procedures Act ("APA"), 5 U.S.C.A. § 706(2)(A), (D)(1996).[9]

*Summary Judgment Standard*

Both parties have moved for summary judgment under Fed.R.Civ.P. 56. There are no factual issues in dispute. Summary judgment is therefore appropriate if one of the moving parties is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

*Amendment of the Rescission*
*Act Schedules*

There is no dispute that, in the absence of the Rescissions Act, NEPA requires an environmental analysis of the permit reissuance. *Natural Resources Defense Council v. Morton,* 388 F.Supp. 829 (D.D.C.1974), *aff'd without opinion,* 527 F.2d 1386 (D.C.Cir.1976), held that issuance of a livestock grazing permit is an agency action for the purposes of NEPA. Defendants do not contest NEPA's general applicability to grazing permits, but focus their arguments entirely on the applicability of the Rescissions Act.

Whether the Rescissions Act applies to the Service's December 2000 reissuance of the Horse Butte permit turns initially on a question of statutory construction. The parties offer competing interpretations of two select phrases in the Rescissions Act. The statute provides, in relevant part:

(a) SCHEDULE FOR NEPA COMPLIANCE.—Each National Forest System unit *shall establish and adhere to* a schedule for the completion of [NEPA] analysis and decisions on all allotments within the National Forest System unit for which NEPA analysis is needed. The schedule shall provide that not more than 20 percent of the allotments shall undergo NEPA analysis and decisions through fiscal year 1996.

(b) REISSUANCE PENDING NEPA COMPLIANCE.—Notwithstanding any other law, term grazing permits which expire or are waived before the NEPA analysis and decision *pursuant to the schedule developed by individual Forest*

---

**9.** Because NEPA itself provides no private right of action, alleged violations of NEPA are ordinarily brought under 10(a) of the APA. *National Coalition to Save Our Mall v. Norton,* 161 F.Supp.2d 14, 19 (D.D.C.2001), *aff'd on*

*other grounds* 269 F.3d 1092 (D.C.Cir.2001). *See also Lujan v. National Wildlife Federation,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

*Service System units,* shall be issued on the same terms and conditions and for the full term of the expired or waived permit.

(c) EXPIRED PERMITS.—This section shall only apply if a new term grazing permit has not been issued to replace an expired or waived term grazing permit solely because the analysis required by NEPA and other applicable laws has not been completed and also shall include permits that expired or were waived in 1994 and 1995 before the date of enactment of this Act.

Pub.L. No. 104–19, § 504, 109 Stat. 194, 212–13 (1995)(emphasis added).

Plaintiffs argue that § 504(b) does not apply to the Horse Butte allotment reissuance because the permit had not expired before the NEPA analysis "pursuant to the schedule" required by § 504(a). They point to the original schedule published in 1995 that set a 1998 NEPA compliance deadline as the only proper § 504(a) schedule. Thus, as of December 2000, when the Horse Butte permit was reissued, the window of NEPA compliance allowed by the Rescissions Act had already closed.

Central to GYC's analysis is the proposition that the schedules established pursuant to § 504(a) of the Rescissions Act may not be amended by the Service. GYC maintains that the statute's use of the term "establish *and adhere to* " unambiguously precludes amendments to the schedule. It further argues that amendments were never envisioned by Congress and would frustrate the purpose of the statute, which was to allow a temporary exemption for NEPA analyses of grazing permit reissuances.

The Service, in turn, contends that this language is at best ambiguous on the question of whether the schedule could be amended. In the face of this ambiguity, the Service points to its reasonable interpretation that the legislation allows for amendments. Therefore, once it determined that the Rescissions Act applied, the Service deemed itself obligated to reissue the Horse Butte permit under the same terms and conditions as the original permit. I A.R. at 196a. Plaintiffs do not dispute that § 504(b) requires the issuance of a permit if the Service had no completed the NEPA analysis and the Service has adhered to the schedule it originally adopted. GYC insists, however, that if the Service had not adhered to the schedule it initially adopted, § 504(b) does not exempt the Service from its obligation to complete a NEPA analysis before it grants a grazing permit.

The Rescission Act's plain language indicates without ambiguity that the Service may not amend its § 504(a) schedule for NEPA compliance. As a fundamental principle of statutory interpretation, a court is required to give effect to every word Congress uses in a statute. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The word "adhere" can only lend itself to one interpretation. Webster's defines "adhere" to mean to "bind oneself to observance (as of a treaty)." *Webster's Third New International Dictionary* 25–26 (1976). Thus, when Congress commanded the Service to "establish and adhere to a schedule" for NEPA compliance, it left no room for the Service to later modify that schedule.

Indeed, the words "modify" and "amend" are antonyms of the word "adhere." To say that one has adhered to a schedule that one has modified, amended and changed is to utter a *non sequitur* or an oxymoron, like a dirty, clean handkerchief.

The necessity of adhering to the plain language of a statute is, in one sense, a constitutional necessity. Judicial reluc-

tance to be guided by the plain meaning of a statute raises an intolerable risk that the court will substitute its judgment for the legislature's. *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 468, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)(Kennedy, J., concurring). Hence, the judiciary restricts itself to the language's plain meaning unless the result reached is absurd or violates an easily perceived legislative purpose. *Id.; Detweiler v. Pena*, 38 F.3d 591, 594–95 (D.C.Cir.1994)(that one might disagree with result of application of plain meaning of statute does not render that result absurd). *See also American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1271 (D.C.Cir. 1994); *Nat'l Treasury Employees Union v. Devine*, 733 F.2d 114, 120 (D.C.Cir. 1984)(plain meaning prevails unless result is absurd or utterly inconsistent with legislative purpose).

The government makes principled policy arguments that flexibility in permitting its agencies to amend and modify the schedule will permit it to work more efficiently and effectively. Perhaps. But its inability to achieve those results does not thereby render the application of the plain meaning of the statue absurd. As *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), makes clear, the threshold question in any issue of statutory interpretation is whether the words of the statute are unambiguous. If so, then the inquiry ends there, and the court must follow the command of Congress.

It must be recalled that Congress, confronted with the backlog and the signifi-

cant risk that permittees would not be able to graze their stock on public lands, did not issue a blanket exemption to the Service from any obligation to conduct NEPA analyses of permit reissuances. In fact, such a bill was discussed and passed over. Instead, Congress decided to hold the Service's feet to the fire by permitting them to create a schedule but then insisting that they adhere to it even though, one supposes, reasons would emerge that might justify its non-adherence. In any human endeavor, perfection (assuming it can ever be achieved) may have to be surrendered to the urgent need for the result. A wise person once pointed out, for example, that a writer's best friend is a deadline (and a page limitation). In this case, Congress did not grant the Service an indefinite time to get the NEPA work done. To the contrary, it insisted that it be done within a certain period of time and that the Service maintain the schedule it set within that period. Unwise or not, Congress chose that course of action. For a court to permit the agencies to modify the schedule to which Congress demanded they adhere is a glaring example of a court substituting its judgment for Congress's.

Finally, it cannot be fairly argued that nullifying the permit defeats the legislative purpose of the Rescissions Act. Again, it was not the purpose of the Rescissions Act to relieve permittees entirely of the consequences of the Service's not completing its NEPA obligations.[10] Rather, the Act creates a temporary exemption from NEPA and relieves the permittees of harsh consequences only if the Service had adopted

---

**10.** Defendants point to statements made by four senators as an indication that Congress was overwhelmingly concerned with protecting the ranchers' interest. 141 Cong. Rec. S4717–02, S4724 (March 28, 1995); 141 Cong. Rec. S4801–02, S4802 (March 29, 1995); 141 Cong. Rec. S4907–01, S4912–S4913 (March 30, 1995). But these state-

ments are inapposite, for they were made during a discussion of a separate bill that would have established a blanket exemption from NEPA for grazing permit reissuances. There was no debate over the final version that was passed into law as the Rescissions Act.

and adhered to a schedule. In this case, the agency certainly did not adhere to the schedule it adopted; it modified it to extend the deadline by several years. Thus, the narrow protection afforded the permittees simply does not apply.

If, as I have concluded, the Service failed to adhere to the schedule that it initially adopted, then it cannot invoke § 504(b) to justify the permit's reissuance. By the time it was reissued, the original schedule as it pertained to Horse Butte had been modified and amended out of existence. The permit reissued to the Munns brothers in December 2000 was certainly not issued pursuant to the original schedule that set the date for the completion of Horse Butte NEPA process in 1998. Plaintiffs are therefore correct in stating that since no exemption was available under the Rescissions Act, the Service's granting of the permit was in violation of NEPA.

### Remedy

To recapitulate the statutory framework of the Rescissions Act, it established a limited and temporary exemption . from NEPA. Thus, where the Rescissions Act does not apply to the reissuance of a grazing permit, NEPA remains in full force. Because I have concluded that the Rescission Act did not apply to the December 2000 permit reissuance for the Horse Butte allotment, it logically follows that the Service violated NEPA by failing to conduct a timely NEPA analysis. The appropriate remedy for the Service's violation will now be addressed.

Plaintiffs filed this action in July 2001 and originally sought four separate remedies: (1) a vacatur of the permit reissued to the Munns Brothers in December 2000; (2) an injunction requiring the Service to conduct an environmental assessment; (3) an injunction suspending all grazing on the Horse Butte allotment until the NEPA process had been completed; and (4) a

declaratory judgment that the Service had violated NEPA by reissuing the permit in December 2000 without first conducting a NEPA analysis. On September 28, 2001, the Service indicated that it had begun a NEPA analysis and was seeking public comment in connection therewith. Letter to Interested Parties from Claude A. Coffin, Acting District Ranger, Hebgen Lake Ranger District, Gallatin National Forest, September 28, 2001, Exh. 1 to Pls. Mot. for Summary Judgment. As a result, plaintiffs no longer seek an injunction requiring NEPA compliance. However, plaintiffs continue to seek a vacatur of the permit, a declaratory judgment, and an injunction prohibiting further cattle grazing on the allotment until the Service complies with NEPA.

As a general matter, an agency action that violates the APA must be set aside. As this Circuit explained in *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077 (D.C.Cir.2001), if a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order." *Id.* at 1084. Based on this authority, I shall vacate the permit, with the understanding that the Service can reissue another permit if and when the NEPA record of decision so allows.

I shall also recommend an injunction prohibiting any livestock grazing on the Horse Butte allotment until the NEPA process is completed. Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA. As the Supreme Court wrote in *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987):

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely,

therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545, 107 S.Ct. 1396. In particular, two cases in this district, including one by Judge Urbina, have preliminarily enjoined bison control programs. *Fund for Animals v. Clark,* 27 F.Supp.2d 8 (D.D.C. 1998); *Fund for Animals v. Espy,* 814 F.Supp. 142 (D.D.C.1993). In *Fund for Animals v. Clark,* Judge Urbina recognized both the procedural and aesthetic injuries to plaintiffs from having to countenance the slaughter of bison. I cannot help but conclude that the same injuries are equally present here.[11] In addition, GYC claims livestock grazing causes environmental harms unrelated to the bison, such as the destruction of wetlands and accompanying deteriorating in water quality.

The Service attempts to portray its failure as that of merely missing a procedural deadline, but this argument is not persuasive. The Service did not simply amend the schedule, it amended the schedule and then relied on that amendment in reissuing the permit under the Rescissions Act. There is no way around the fact that this automatic reissuance was a substantive violation of NEPA, not a mere procedural failing. After all, it has, in effect, postponed the NEPA analysis for several years. In this light, an injunction and set aside of the Service's action is not the "drastic remedy" described in *Brock v. Pierce County,* 476 U.S. 253, 260, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) that should be avoided, if possible. This is no mere brief postponement of a deadline but such a substantial modification of a schedule that

agency action, proposed to be completed in 1998, would not be finished until 2004.

Additional equity concerns suggest that an injunction is appropriate. Because the Service has already initiated the NEPA analysis for the Horse Butte allotment, it can be safely presumed that the suspension of grazing rights (assuming the record of decision resulting from the NEPA process allows grazing) would last for one season at most. I would also encourage the permittees to see if GYC's offer of alternative grazing areas still stands. Unless and until someone establishes that it is impossible for the cattle to graze anywhere else without significant cost or expense, the balancing of the equities clearly favors maintaining the area without grazing until the NEPA analysis is completed. The NEPA analysis is, after all, designed to assess the environmental impact of grazing before the permit issues.

## CONCLUSION

In accordance with the above discussion, I recommend that *Plaintiffs Greater Yellowstone Coalition, et al.'s Motion for Summary Judgment* [# 17] be **GRANTED**. I further recommend that *Defendants' Motion for Summary Judgment* [# 22] be **DENIED**.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations.** *See Thomas v. Arn,* 474

---

**11.** The Service at one point suggests that bison heading for the Horse Butte peninsula would have to be slaughtered even if the Horse Butte allotment were closed to grazing, for the bison must cross private inholdings to reach the peninsula. A map. included in the Joint Bison Plan refutes this contention, for it shows quite clearly that the private lands only cover a portion of the entrance to the peninsula. II A.R. 1060A at 313. At the very least, closure of the allotment to livestock grazing would significantly reduce the need for hazing and killing of bison.

U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

May 13, 2002.